In re CITY OF NEW YORK (SPECIAL FUND).

(Supreme Court, Appellate Division, First Department. April 22, 1910.)

1. EVIDENCE (§ 83*)—PRESUMPTIONS—PERFORMANCE OF OFFICIAL DUTY.
    The law presumes that the surrogate of a county performed his duty in paying defalcations in the office from an appropriation therefor, as authorized by a statute empowering the board of supervisors to provide for the amount of the deficiencies in the office.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 105; Dec. Dig. § 83.*]

2. COUNTIES (§ 59*)—FUNDS—TRUST FUNDS.
    Where the board of supervisors of a county authorized to provide for the payment of defalcations in the surrogate's office, whereby persons and estates suffered losses, appropriated more than was necessary to pay the defalcations, the county or its successor was entitled to the return of the amount not used.
    [Ed. Note.—For other cases, see Counties, Dec. Dig. § 59.*]

3. DEPOSITS IN COURT (§ 11*)—TRUST FUNDS—"PAID INTO COURT."
    Money appropriated by the board of supervisors of a county to pay defalcations in the surrogate's office, and intrusting the distribution thereof to the surrogate in his administrative capacity, is not money "paid into court," within Laws 1892, c. 651, § 9, providing for the payment over of funds paid into court.
    [Ed. Note.—For other cases, see Deposits in Court, Dec. Dig. § 11.*]

Petition by the City of New York, by its Comptroller, for the payment of a fund in the hands of the Chamberlain to the City of New York, in which the Attorney General appeared and asked that the fund be paid over to the State Treasurer. Payment of fund to the City of New York ordered.

Argued before CLARKE, McLAUGHLIN, LAUGHLIN, SCOTT, and DOWLING, JJ.

Theodore Connoly, for the motion.
Robert F. Beyer, opposed.

PER CURIAM. This matter comes before the court on a petition of the city of New York, by its comptroller, asking that a certain fund

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

now in the hands of the chamberlain, amounting at the date of the petition to $39,772.08, be paid over to the city of New York. The application is opposed by the Attorney General, who asks that the fund be paid over to the State Treasurer, under the provisions of section 9, c. 651, Laws 1892. This fund is the residuum of a larger sum which was raised by the county of New York in 1870 and paid over to the surrogate of the county of New York to make good the losses suffered by various persons and estates in consequence of defalcations in said surrogate's office.

Although the available evidence on the subject is not always of the first order, the referee has carefully collated and compared such as is available, and has been able to trace satisfactorily the history of the fund. On January 1, 1870, when Gideon J. Tucker retired from the office of surrogate of New York county, he handed a letter to his successor, Robert C. Hutchings, informing him that one James Walker Fowler, who had been assistant surrogate, had received and appropriated to his own use sums amounting to $33,079.65. Appended to this letter was a list of persons and estates who had suffered by these misappropriations, and of the several amounts which each had thus lost. The true amount of these defalcations amounted, according to said list, to $31,079.65; the larger sum mentioned by Surrogate Tucker being evidently the result of an error in addition. This letter was transmitted by Surrogate Hutchings to the board of supervisors with a request that competent persons be appointed to examine into the precise character and extent of the deficiency.

By section 10, c. 382, Laws 1870, passed April 26, 1870, the board of supervisors was authorized and directed to investigate the alleged deficiencies in the office of the surrogate, to employ an accountant for that purpose, and to provide for the amount of such deficiencies, including the same in the taxes for the ensuing year.

From the minutes of the board of supervisors under date of May 26, 1870, it appears that Charles W. Wilbour, an accountant appointed by said board, reported that to replace the several sums unaccounted for with interest to the 1st day of January, 1870, is $58,030.29. The fees of the accountants were $6,500, and this was evidently included by Wilbour in his estimate, because the amount paid to the surrogate was $51,530.29, being just $6,500 less than the amount reported by Wilbour as necessary to make up the deficiencies. Surrogate Hutchings appears to have expended all of this sum, except $13,786.86, in paying the deficiencies. The evidence on that subject will be returned to later. This sum of $13,786.86 was on May 22, 1871, deposited in the Union Trust Company, and constituted with the accretions of interest the fund involved in this application. It was transferred by the surrogate on October 10, 1873, and deposited in the Farmers' Loan & Trust Company.

By chapter 350, Laws 1884, the several General Terms of the Supreme Court were authorized to appoint persons to examine the books, accounts, and vouchers in the several surrogates' offices, and make report thereon, whereupon the surrogates were required to pay over to the treasurers of their respective counties all moneys and securities then held by them. The General Term in this department appointed

122 N.Y.S.—42

for this purpose William Pitt Shearman, who made a report which cannot be found. His report was confirmed by order dated December 30, 1886, to which was appended a copy of one of the schedules included in his report. With reference to the fund now in controversy, then represented by a certificate of deposit of the Farmers' Loan & Trust Company, the order provides as follows:

"It appearing that a certain certificate of deposit in the Farmers' Loan & Trust Company, which with the interest thereon to July 1, 1885, amounts to $25,508.11, forms part of the aforesaid moneys and constitutes a part of the assets held by the surrogate in excess of his liabilities, and that there is some doubt as to the origin of so much of such excess as is represented by said certificate and as to whether or not it arose otherwise or from the appropriation by the board of supervisors of a sum greater than was needed to serve the purpose for which such board was by section 10, c. 382, Laws of 1870, authorized to make an appropriation.

"It is further ordered and adjudged that so much of said moneys, funds, and securities as are represented by the said certificate of deposit with the interest thereon to the time of payment or transfer to said chamberlain, together with such interest as shall subsequently accrue, or to be payable thereon, to be held by the said chamberlain as a special fund subject to the special order of the General Term of this court."

The certificate of deposit was turned over to the chamberlain of the city of New York (being also the treasurer of the county of New York) on March 19, 1887. The doubt expressed in the order of the General Term as to the origin of this fund may, I think, be resolved from the available evidence.

The first thing that attracts attention is the large discrepancy between the amount of the defalcation reported by Surrogate Tucker ($33,079.65) and the amount of the deficiencies reported by Wilbour ($58,030.59 less $6,500, accountant's fee, being net $51,530.29). There are two reasonable explanations for this discrepancy.

In the first place, the letter of Surrogate Tucker shows that he did not include, in his estimate of dafalcations, interest on the sums misappropriated, while Wilbour's report specifically states that his estimate includes interest at 7 per cent. per annum to January 1, 1870. The referee has computed interest on the amounts specified in Surrogate Tucker's letter, at the then legal rate, down to January 1, 1870, and finds that it would have required $43,590.76 to pay the deficiencies reported by Surrogate Tucker, with interest.

In the second place, the letter of Surrogate Tucker referred only to defalcations by Fowler. The Wilbour report covers all deficiencies. That there were other defalcations than those of Fowler appears reasonably certain, because at some time between January 1, 1870, and March 29, 1870, there was returned to the surrogate by one Wm. B. Aitken mortgages amounting to $7,888, and cash to the amount of $3,346.66, total $11,234.66, and there is other evidence that said Aitken, a clerk in the surrogate's office, had misappropriated moneys. Wilbour was not an employé of the surrogate's office. His report was made as of January 1, 1870, and was actually handed in very shortly after the above-mentioned restitution by Aitken. It seems altogether probable, therefore, that the deficiencies reported by him included the sum of $11,234.66, and that he was either ignorant of, or took no note of, the return of that sum. If so, the county appropriated in the

first instance $11,234.66 more than was necessary to meet the then existing deficiencies. This in our opinion accounts for the existence of the fund now under consideration.

The evidence as to the disposition made by Surrogate Hutchings of the money appropriated by the board of supervisors is not very satisfactory. It is certain, however, that he received $51,530.29 and deposited in the Union Trust Company $13,786.86. This leaves $37,743.43 unaccounted for. There is a presumption that the surrogate, a public officer, fulfilled his duty, and it is not going too far to presume that this latter sum was used to pay the deficiencies for whose payment it had been appropriated.

It will be recalled that the deficiencies reported by accountant Wilbour, over and above the expenses, amounted to $51,530.29. As has already been pointed out, there was subsequently returned by Aitken $11,234.66, which had apparently been included in the Wilbour report. This would leave $40,296.29 of public money necessary to pay all deficiencies with interest. This is about $3,500 more than the surrogate appears to have disbursed. It appears, however, from the letter of Surrogate Tucker, that a considerable number of Fowler's defalcations consisted of small sums. It is not at all improbable that many of those who had suffered losses were paid, and consented to receive, the principal sums due them either without interest, or with interest at less than the legal rate. This would easily account for the difference between the amounts apparently due, and the amounts apparently paid out by the surrogate. Some confirmation of this view is to be derived from the following:

Shearman's report cannot be found. There was presented to the referee, however, what purported to be a typewritten copy of it, in which reference is made to an old journal kept in the handwriting of one Van Schaick, who was for many years chief clerk in the surrogate's office, and afterwards himself surrogate. These entries showed that the surrogate had drawn from the appropriation on these several dates, down to August 20, 1871, the aggregate sum of $38,651.59, leaving a balance of the appropriation of $12,878.70, which with accrued interest to February 8, 1871, would amount to the precise sum that was on that day deposited in the Union Trust Company. It is now 39 years since that fund was deposited and more than 40 years since the defalcation occurred. In all that time, so far as appears, no claim has been made by any person (other than those paid by Surrogate Hutchings) for payment out of the fund.

It seems that, from all these circumstances, it is entirely safe to conclude that every claim against the appropriation has long since been paid, and that the fund is the unexpended residuum of the appropriation made by the board of supervisors in 1870.

The next question is: What disposition shall be made of it?

The Attorney General advances two propositions: First, that the moneys appropriated by the board of supervisors constituted a trust fund; that the county parted with all title to it when the appropriation was made, and, although there does not appear to be any possible cestui que trust, still the fund must remain unimpaired presumably to the end of time. This proposition we think involves a mistaken idea

as to the nature of the original fund. The board of supervisors were authorized to make provision for the payment of the deficiencies. Acting upon the best information available, it appropriated what appeared to be necessary. As the event proved, it appropriated too much. Upon the plainest principles, the city, as the successor in title and interest to the county, is entitled to the return of the amount in excess of that necessary to meet the purpose of the appropriation. If a trust was impressed upon any part of the fund, it was so impressed only upon so much of it as was required to pay the deficiencies, and cannot possibly be extended to the excess not so required.

The Attorney General's second proposition is that the fund should be paid over to the State Treasurer under the provisions of section 9, c. 651, Laws 1892. The act applies to moneys "paid into court," and contemplates that the moneys to be so transferred shall be those which may be subject to claim. We do not think that the appropriation was "paid into court" in the sense in which those words are used in the act. It consisted of county moneys appropriated to pay certain claims which the county assumed, and was intrusted to the surrogate for disbursement, not in his judicial, but in his administrative, capacity, for in 1870 he was both a judicial and an administrative officer.

In our opinion the city of New York is clearly entitled to a return of the money, and it should be returned, after payment therefrom of the proper referee's fees and disbursements.